FILED

2019 APR 23 PM 3:46

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2019 Grand Jury

CR 19- 0254 PSG

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>MEHDI HASHEMI,<br>   aka "Eddie HASHEMI," and<br>FEROZ KHAN,<br>   aka "Feroskhan,"<br>   aka "Feros,"<br><br>            Defendants. | CR No. 19-<br><br>I N D I C T M E N T<br><br>[50 U.S.C. § 1705(a) and (c):<br>Conspiracy to Violate the<br>International Emergency Economic<br>Powers Act; 50 U.S.C. § 1705(a)<br>and (c): Violation of the<br>International Emergency Economic<br>Powers Act; 18 U.S.C. § 554:<br>Smuggling Goods Out of the United<br>States; 18 U.S.C. § 1956(a)(2)(A):<br>Money Laundering; 13 U.S.C.<br>§ 305(a)(1): Unlawful Export<br>Information Activities; 18 U.S.C.<br>§ 1001(a)(2): Material False<br>Statements; 18 U.S.C. § 2(a):<br>Aiding and Abetting; 18 U.S.C.<br>§ 2(b): Causing an Act to be Done;<br>Forfeiture] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

A.   Statutory and Regulatory Background

    1.   International Emergency Economic Powers Act and Iranian Sanctions

    1.   The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, authorizes the President of the United States to impose trade sanctions on a country in response to unusual and extraordinary threats to the national security, foreign policy, and economy of the United States presented by that country.

    2.   Beginning in 1995, by Executive Orders and pursuant to the authority in IEEPA, the President of the United States imposed such sanctions on the Islamic Republic of Iran ("Iran").  Among those sanctions are the Iranian Transactions and Sanctions Regulations ("ITSR"), which were promulgated under the authority of the President's Executive Orders and IEEPA, and which the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") administers.

    3.   Under the ITSR, unless a person obtains an export license from OFAC, or unless an export transaction falls within a limited set of enumerated general licenses or authorizations, goods, technology, and services may not be exported, re-exported, sold, or supplied, directly or indirectly, from the United States, or by a United States person, wherever located, to Iran.

    2.   IEEPA and the Export Administration Regulations

    4.   Pursuant to IEEPA, on August 17, 2001, the President issued Executive Order 13222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001.  See 66 Fed.

Reg. 44,025 (Aug. 22, 2001).  While in effect, the EAA regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the Department of Commerce ("DOC")'s Bureau of Industry and Security ("BIS") promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contained restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA.  See 15 C.F.R. § 730.2.  In Executive Order 13222, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA.  Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by that Executive Order through August 2018, see, e.g., 82 Fed. Reg. 39,005 (Aug. 16, 2017), at which time the Export Control Reform Act provided new statutory authority for the EAR.

5.    Through the EAR, BIS reviewed and controlled the export from the United States to foreign countries of, among other things, certain commodities and technology.  See 15 C.F.R. §§ 734.2-.3.  In particular, BIS placed restrictions on the export and re-export of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States, among other reasons.  Under the EAR, whether a license is required depended on several factors, including the technical characteristics of the item, policy reasons for export controls, the destination country, the end user, and the end use.  Items subject to EAR controls based on their technical characteristics were identified on the Commerce Control List, or

3

"CCL," set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1.  Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which imposed export control requirements depending on destination, end use, and end user.

6.   Each ECCN also specified the applicable reasons for control (such as national security, short supply, anti-terrorism, etc.).  By referencing the reasons for control set forth in the applicable ECCN, the Commerce Country Chart then specified for which countries a license was required before a commodity could be exported there.  See 15 C.F.R. Part 738, Supp. No. 1.  The Commerce Country Chart was essentially a matrix with two axes, one being the country and the other being the reason for export control.

7.   The DOC, through the U.S. Census Bureau ("BOC"), required the filing of electronic export information ("EEI") through the Automated Export System ("AES") pursuant to Title 13, United States Code, Section 305; the EAR; and the Foreign Trade Regulations ("FTR"), Title 15, Code of Federal Regulations, Part 30.  The purpose of these requirements was to strengthen the United States government's ability to prevent the export of certain items to unauthorized destinations and end-users because the AES aided in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation.  15 C.F.R. § 30.1(b).  With exceptions not relevant to the exports at issue in this Indictment, EEI was required to be filed for, among other things, the export of commodities (1) valued over $2,500 per the Harmonized Tariff Schedule of the United States of America ("HTSUSA") commodity classification code; (2) destined for Iran, regardless of value; and (3) requiring

1  an export license, regardless of value or destination.   EEI was

2  required to contain, among other things:   the names and addresses of

3  the parties to the transaction; and the description, quantity, and

4  value of the items exported.   15 C.F.R. § 30.6(a).

5  B.   Background on Computer Numerical Control Machines

6      8.   Computer Numerical Control ("CNC") was the automated

7  control of machining tools by means of a computer.   A CNC machine

8  altered a blank piece of material (such as metal, plastic, wood,

9  ceramic, or composite) to meet precise specifications by following

10  programmed instructions and without a manual operator.

11      9.   Vertical Machining, also known as milling, relied on rotary

12  cutters to remove metal from a workpiece.   Vertical machining

13  occurred on a vertical machining center (VMC), which employed a

14  spindle with a vertical orientation.   With a vertically oriented

15  spindle, tools stick straight down from the tool holder, and often

16  cut across the top of a workpiece.

17      10.   Turning Centers were machines used to make cylindrical

18  parts, where the cutting tool moved in a linear fashion while the

19  workpiece rotates, thereby reducing the diameter of the workpiece to

20  a specified dimension.

21      11.   Manual mills and lathes also cut and shape metal and other

22  materials, but they were mechanically operated.   Chip conveyors were

23  used to carry away waste such as metal chips discarded during the

24  machining process.   Bar feeders were designed to deliver a continuous

25  supply of machining stock (such as metal block) to the machine tool.

26      12.   According to the EAR, items classified under ECCN 2B201

27  included:   "Machine tools, and any combination thereof, other than

28  those controlled by 2B001, for removing or cutting metals, ceramics

or 'composites,' which, according to manufacturer's technical specifications, can be equipped with electronic devices for simultaneous 'contouring control' in two or more axes." Within 2B201 were subsections that further specify what characteristics a machine tool could have that meet the threshold for 2B201 control. For example, 2B201.a controlled machine tools for turning that have a positioning accuracy better (less) than 4.5 micrometers along any linear axis, capable of machining diameters greater than 35 millimeters. 2B201.b.1 controlled machine tools for milling that have a positioning accuracy equal to or less (better) than 4.5 micrometers along any linear axis.

13. Items classified under ECCN 2B201 were controlled for nuclear non-proliferation and anti-terrorism reasons, and required a BIS license for export to both the United Arab Emirates ("UAE") and Iran. The following CNC machine tools were classified by BIS under ECCN 2B201:

a. Cincinnati Arrow 1250C Vertical Machining Center ("Arrow 1250C");

b. Cincinnati Arrow 750 Vertical Machining Center ("Arrow 750");

c. Cincinnati Arrow 500 Vertical Machining Center ("Arrow 500");

d. Cincinnati Avenger 250T Turning Center ("Avenger 250T");

e. Cincinnati Avenger 200T Turning Center ("Avenger 200T"); and

f. Cincinnati Hawk 250 Turning Center ("Hawk 250").

14.   According to the EAR, items classified under ECCN 2B991 included: "Numerical control units for machine tools and 'numerically controlled' machine tools."  Items classified under ECCN 2B991 were controlled for anti-terrorism only, and required a BIS license for export to Iran.  The following machine tools were classified by BIS under ECCN 2B991:

a.   Traub TNL 16G CNC Swiss Screw Machine ("TNL 16G"); and

b.   Traub TND 400 CNC Lathe ("TND 400").

C.   Nuclear Suppliers Group

15.   The aim of the Nuclear Suppliers Group ("NSG") Guidelines was to ensure that nuclear trade for peaceful purposes did not contribute to the proliferation of nuclear weapons or other nuclear explosive devices, and that international trade and cooperation in the nuclear field was not hindered unjustly in the process.  The NSG maintained two lists of items controlled for export in participating states, including the United States: 1) the "Trigger List," which governed transfers of nuclear items, and 2) the "Dual-Use List," which governed transfers of nuclear-related dual-use items.  The NSG Control Lists were regularly updated and published by the International Atomic Energy Agency via "Information Circulars," abbreviated as "INFCIRCs."  The NSG Trigger List was published in IAEA INFCIRC/254/Part 1 and the Dual-Use List was published in IAEA INFCIRC/254/Part 2.

16.   Any item controlled under ECCN 2B201 was also listed in the IAEA Information Circular 254, Part 2 ("INFCIRC/254/Part 2").

17.   The participating governments in the NSG were Argentina, Australia, Austria, Belarus, Belgium, Brazil, Bulgaria, Canada,

7

China, Croatia, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Kazakhstan, Republic of Korea, Latvia, Lithuania, Luxembourg, Malta, Mexico, Netherlands, New Zealand, Norway, Poland, Portugal, Romania, Russian Federation, Serbia, Slovakia, Slovenia, South Africa, Spain, Sweden, Switzerland, Turkey, Ukraine, United Kingdom, and the United States.

18.  In October 2009, the UAE Government promulgated Federal Law by Decree No. 6/2009 concerning the peaceful uses of nuclear energy. Article 5 of that law stipulated that the UAE Federal Authority for Nuclear Regulation ("FANR") "shall ensure the compliance with the prevention of the use of Nuclear Facilities and Nuclear Materials and technology for non-peaceful purposes in order to attain effective control of Safety, Nuclear Safety, Nuclear Security, Radiation Protection and Safeguards."  Pursuant to this law, FANR issued Regulation Number 9 in 2014, which prohibited the import, export, transit, and transshipment of any item listed in IEAE INFCIRC/254/Part 2, absent a license issued by FANR.

19.  On July 20, 2015, the United Nations Security Council adopted Resolution 2231 ("UNSCR 2231," also known as S/RES/2231 (2015)) concerning the Joint Comprehensive Plan of Action with Iran ("JCPOA").  As a permanent member of the Security Council, the United States voted in favor of the adoption of the resolution. Subsequently, on January 16, 2016, known as "Implementation Day", the JCPOA went into effect.  Article 6.1. of UNSCR 2231 provided that a "Procurement Working Group," composed of China, France, Germany, Iran, Russia, and the United Kingdom shall "review and decide on proposals by states seeking to engage in the sale supply, or

transfer" of all items, materials, equipment, goods and technology set out in INFCIRC/254/Part 2, as updated by the NSG, for non-nuclear civilian end-use in Iran.  Accordingly, after January 16, 2016, neither OFAC nor FANR was able to issue any license authorizing the transfer to Iran of items listed in IAEA INFCIRC/254/Part 2, without authorization from the Procurement Working Group.

D.    Background on the Defendant and Entities

20.   Defendant MEHDI HASHEMI ("HASHEMI"), also known as ("aka") "Eddie Hashemi," a citizen of both the United States and Iran, was the Chief Executive Officer of Earth Best Products, Inc. ("Earth Best"), a California corporation headquartered and doing business in Los Angeles, California.  The California Franchise Tax Board suspended Earth Best in October 2013, and the company was dissolved in September 2018.  Defendant HASHEMI was also an employee of Company A.

21.   Neither HASHEMI nor Earth Best applied to OFAC or the BIS, or through such application obtained, a license to export any commodity, including any CNC machine, from the United States to either the UAE or Iran.

22.   Company A was a company located in Tehran, Iran, that held itself out as a manufacturer and supplier of textiles, medical and automotive components, and spare parts.

23.   Freight Forwarder #1 was a company located in the UAE that provided freight forwarding services.  A freight forwarder arranges shipments on behalf of a person or company, typically by contracting with a carrier or multiple carriers to move the goods.

24.   Freight Forwarder #2 was a freight forwarder located in Toronto, Canada.

25.   Freight Forwarder #3 was a freight forwarder located in Long Beach, California.

26.   Freight Forwarder #4 was a freight forwarder located in Hanover Park, Illinois and Bloomingdale, Illinois.

27.   Freight Forwarder #5 was a freight forwarder located in Tehran, Iran.

28.   Freight Forwarder #6 was a freight forwarder located in the UAE and Iran.

29.   Supplier #1 was a supplier of CNC machines, parts, and related equipment located in North Ontario, Canada.

30.   Supplier #2 was a supplier of CNC machines, parts, and related equipment located in Schaumburg, Illinois.

31.   Supplier #3 was a supplier of CNC machines, parts, and related equipment located in Cincinnati, Ohio.

32.   Supplier #4 was a supplier of CNC machines, parts, and related equipment locate in Scottsdale, Arizona.

33.   Supplier #5 was a supplier of CNC machines, parts, and related equipment located in Dayton, Ohio.

34.   Supplier #6 was a supplier of CNC machines, parts, and related equipment located in Long Beach, California.

35.   Supplier #7 was a gunsmithing company located in Driggs, Idaho, that also supplied a CNC machine, parts, and related equipment.

36.   Supplier #8 was a supplier of CNC machines, parts, and related equipment located in Maitland, Florida.

37.   Supplier #9 was a supplier of CNC machines, parts, and related equipment located in Los Angeles, California.

38.   Container Company #1 was a supplier of shipping containers located in Bampton, Ontario.

39.   Container Company #2 was a supplier of shipping containers located in St. Paul Park, Minnesota.

40.   Container Company #3 was a supplier of shipping containers located in Cleveland, Ohio.

41.   Container Company #4 was a supplier of shipping containers located in Santa Barbara, California.

42.   PayPal Holdings, Inc. ("PayPal") operated a worldwide online payments system that supported online money transfers and served as an electronic alternative to traditional paper methods like checks and money orders.

43.   Yahoo! was a web services provider that provided email services to its subscribers.

44.   The United States Department of Homeland Security, Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE") and the United States Department of Commerce, Bureau of the Census ("BOC") and BIS were all parts of the executive branch of the United States government and were responsible for collecting and using information regarding exports from the United States.

45.   These Introductory Allegations are incorporated into each and every count of this Indictment as though fully alleged therein.

COUNT ONE

[50 U.S.C. § 1705(a), (c);

31 C.F.R. §§ 560.203, 560.204, 560.206 and 560.208;

15 C.F.R. §§ 742.1, 742.3, 742.8, 746.7, 758.1, 764.2]

A.   OBJECTS OF THE CONSPIRACY

1.   Beginning on a date unknown to the Grand Jury, but no later than June 25, 2015, and continuing through on or about April 9, 2018, in Los Angeles County, within the Central District of California and elsewhere, defendant MEHDI HASHEMI ("HASHEMI"), also known as ("aka") "Eddie Hashemi," and defendant FEROZ KHAN ("KHAN"), aka "Feroskhan," aka "Feros," and others known and unknown to the Grand Jury, knowingly conspired and agreed with each other to knowingly and willfully commit the following offenses against the United States:

a.   To knowingly and willfully enter into transactions within the United States that evaded and avoided, and had the purpose of evading and avoiding, the regulations governing trade and exports from the united States to Iran, and by a United States person wherever located, to Iran, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.203;

b.   To export, and attempt to export, Computer Numerical Control ("CNC") machines from the United States to Iran, via a third country, the United Arab Emirates ("UAE"), in violation of the regulations that apply to exports to Iran, without first having applied for, or through such application obtained, from the United States Department of Treasury, Office of Foreign Assets Control ("OFAC"), a license or authorization for such export, in violation of 50 U.S.C. § 1705(a) and (c) and 31 C.F.R. § 560.204.

12

c.   To approve, finance, and facilitate, and to attempt to approve, finance, and facilitate a transaction by a foreign person in violation of the regulations that govern trade and exports to Iran, without first having applied for, or through such application obtained, from OFAC, a license or authorization for such export, in violation 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.208.

d.   To export, and attempt to export, CNC machines from the United States to the UAE, without first having applied for, or though such application obtained, from the United States Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), a license for authorization for such export, in violation of 50 U.S.C. § 1705(a) and (c) and 15 C.F.R. §§ 15 C.F.R. §§ 742.1, 742.3, 742.8, 746.7, 758.1, and 764.2.

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

2.   The objects of the conspiracy were to be accomplished in substance as follows:

a.   Defendant HASHEMI would purchase CNC machines and related equipment from U.S. and Canadian suppliers.  Defendant HASHEMI would purchase the machines on behalf of, and for the benefit of, Company A.

b.   Defendant HASHEMI would purchase shipping containers for the CNC machines and related equipment from U.S. and Canadian suppliers.

c.   Defendant HASHEMI would directly purchase, or through another freight forwarder, indirectly purchase, the services of U.S. and Canadian freight forwarders to facilitate the shipment of CNC machines and related equipment from the United States to the UAE.

1     d.     Defendant HASHEMI would create false and forged

2  invoices and packing lists, including by using forged letterheads and

3  forged signatures that falsely indicated the salesperson of the

4  machines, contact information for the salesperson of the machines,

5  the customer for the machines, the value of the machines, and that

6  restoration work had been performed on the machines.  Defendant

7  HASHEMI would provide these false and forged invoices to U.S.,

8  Canadian, and UAE freight forwarders.

9     e.     Defendant HASHEMI would cause the U.S. and Canadian

10  freight forwarders to file Electronic Export Information ("EEI") with

11  the United States government that falsely indicated (1) the United

12  States Principal Party ("USPPI"), (2) the ultimate consignee, and

13  (3) the value of the shipment.

14     f.     Defendant HASHEMI would certify and submit to the

15  United States government false License Determination Fact Sheets,

16  which falsely indicated that (1) the CNC machines that he was

17  exporting were not controlled for export under the Export

18  Administration Regulations and (2) the destination country for the

19  machines was the UAE.

20     g.     Defendant HASHEMI would certify and submit to the

21  United States government a false "Statement By Ultimate Consignee and

22  Purchaser" form (Form BIS-711), which falsely indicated that: (1) the

23  destination country for the machines was the UAE; (2) the purchaser

24  of the machines was Freight Forwarder #1; and (3) an affiliate of

25  Freight Forwarder #1 was the ultimate consignee.

26     h.     Through defendant KHAN, defendant HASHEMI would

27  purchase the services of UAE and Iranian freight forwarders to

28

14

facilitate the shipment of CNC machines and related equipment from the UAE to Iran.

        i.    In matters within the jurisdiction of the DOC, BIS, and the CBP, defendant HASHEMI would lie to federal agents from those agencies about his export of CNC machines from the United States.

C.    OVERT ACTS

3.    In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Central District of California and elsewhere:

The 2016 Canada Export via North Ontario, Canada

Overt Act No. 1:    On or before June 25, 2015, defendant HASHEMI submitted a request for a Traub CNC machine to an online supplier.

Overt Act No. 2:    On December 9, 2015, a representative of a Canadian company wrote an email that was forwarded to defendant HASHEMI that stated: "Is this is (sic) at all related to the your previous request to ship a CNC machine to Iran, the one we just discussed about earlier today?  If the ultimate destination is still to Iran, then this would still be a sanction booking."  Later that day, a representative of another Canadian shipping company wrote to defendant HASHEMI:

> To answer your question by shipping these two machines to Dubai, Yes, we can do it but the carreir (sic) needs confirmation that the machines are for buyer & final destination is : Dubai . . . Will not do any forwarding to Iran . . . . Otherwise, it is still be a sanction booking . . . .

Overt Act No. 3:    On December 9, 2015, defendant HASHEMI wired $6,250 from his Wells Fargo Bank Account (-2160) (the "Wells Fargo Account"), located in Los Angeles, California, to the account of a

representative of Supplier #1 at TD Canada Trust in Thornhill, Canada (the "Supplier #1 Account"), in payment for a 1995 TND 400 and related equipment.

Overt Act No. 4:   On or about December 15, 2015, a representative of a Canadian shipping company sent defendant HASHEMI an emial attaching a Letter of Indemnity concerning the shipment of a CNC machine.   The Letter of Indemnity read in part:

> In consideration of you carrying the above goods to the port of Bandar Abbas in Iran which is subject to national and international restrictions, we irrevocably undertake and agree as follows: . . . . We hereby warrant and guarantee that we and all our affiliates, subsidiaries, agents, or employees are fully allowed to conduct business transactions/shipments with Iran as referred to in the regulations adopted by the International community such as but not limited to the United Nations resolution related to Iran, the relevant European Union regulation(s) on restrictive measures against Iran and the Iranian Transactions Regulations – 31 CFR Part 560 – as well as the Special Designated National and Blocked Persons List (SDNs list published by the Office of Foreign Asset Control) of the United States of America.

Overt Act No. 5:   On December 11, 2015, defendant HASHEMI wired $6,675.82 from his Wells Fargo Account to the account of a representative of Supplier #1 at the Bank of Nova Scotia in Ontario, Canada, in payment for a 1995 TND 400 and related equipment.

Overt Act No. 6:   On December 10, 2015, defendant HASHEMI sent an email to a representative of Supplier #1 affirming that he had transferred $17,005 (Canadian dollars, or "CAD") in payment for a 1995 TND 400 and related equipment.

Overt Act No. 7:   On January 14, 2016, defendant HASHEMI wired $1,599.55 from his Citibank Account (-6747), located in Los Angeles, California (the "Citibank Account"), to the account of Container

Company #1 at the Royal Bank of Canada in Toronto, Canada (the "Container Company #1 Account"), in payment for a shipping container.

Overt Act No. 8:   On or before January 20, 2016, defendant HASHEMI purchased a 1997 Avenger 200T and related equipment from Supplier #2.

Overt Act No. 9:   On January 23, 2016, defendant HASHEMI wrote an email to a representative of Freight Forwarder #1 requesting that s/he provide a quote for the shipment of containers from the UAE to Iran, noting that "[t]he commodity of containers consist of CNC Machinery."

Overt Act No. 10:   On January 28, 2016, defendant HASHEMI wired an additional $421.48 from his Citibank Account to the Container Company #1 Account in payment for a shipping container.

Overt Act No. 11:   On February 24, 2016, defendant HASHEMI sent an email to a representative of Company A, attaching a Conditional Sales Order identifying Company A as the "Customer" for the 1997 Avenger 200T, the 1995 TND 400, and related equipment.   The Conditional Sales Order, which appeared on forged Supplier #2 letterhead, falsely identified Supplier #2 as the supplier of both machines and falsely indicated that the total value of the machines was $5,500.

Overt Act No. 12:   On February 25, 2016, defendant HASHEMI wired $4,559 from his Citibank Account to the account of Freight Forwarder #2 at Toronto Dominion Bank, in Toronto, Canada (the "Freight Forwarder #2 Account"), in payment for Freight Forwarder #2's services in facilitating the shipment of a 1997 Avenger 200T, a 1995 TND 400, and related equipment from the United States and Canada to the UAE.

Overt Act No. 13:   On March 8, 2016, defendant HASHEMI sent an email to a representative of Company A, attaching a Restoration Order identifying Company A as the "Customer" for the 1997 Avenger 200T, the 1995 TND 400, and related equipment.  The Restoration Order, which appeared on forged Supplier #2 letterhead, falsely identified Supplier #2 as having "overhauled" both machines.

Overt Act No. 14:   On March 13, 2016, defendant HASHEMI sent an email to defendant KHAN confirming that "a payment amount of $2070 was deposited into an account that was forwarded to me" and attaching a Conditional Sales Order identifying Company A as the "Customer" for the 1997 Avenger 200T, the 1995 TND 400, and related equipment.  The Conditional Sales Order falsely identified a representative of Supplier #2 as the "Salesperson" for both machines, provided a false email address for that person, and falsely indicated that the total value of the machines was $5,500.

Overt Act No. 15:   On March 21, 2016, defendant KHAN sent an email to defendant HASHEMI attaching a Final Commercial Invoice. That invoice was sent to defendant HASHEMI's attention at Company A and indicated that he owed a remaining balance of $239.40 for freight and clearance charges on a shipping container.

Overt Act No. 16:   On April 4, 2016, defendant HASHEMI wired $239.40 from his Citibank Account to the account of Freight Forwarder #1 at Bank of Baroda in Dubai, UAE, in payment of Freight Forwarder #1's freight forwarding services.

Overt Act No. 17:   On April 6, 2016, defendant KHAN sent an email to defendant HASHEMI attaching a Combined Transport Bill of Lading for the shipment of a 1997 Avenger 200T, a 1995 TND 400, and

related equipment from Freight Forwarder #1 in the UAE to Company A in Iran.

Overt Act No. 18:   On April 6, 2016, defendant HASHEMI sent an email to a representative of Company A attaching a Combined Transport Bill of Lading for the shipment of a 1997 Avenger 200T, a 1995 TND 400, and related equipment from Freight Forwarder #1 in the UAE to Company A in Iran.

The May 2016 Export via Norfolk, Virginia

Overt Act No. 19:   On March 3, 2016, a representative of Supplier #3 sent defendant HASHEMI an email attaching an invoice for two Arrow 1250 CNC machines, indicating the total selling price was $16,000.

Overt Act No. 20:   On March 11, 2016, defendant HASHEMI sent a representative of Supplier #3 an email affirming that he had "made a deposit for amount of $8000.00 as of this morning."

Overt Act No. 21:   On March 11, 2016, defendant HASHEMI wired $8,000 from his account at Wells Fargo in Los Angeles (-4737) (the "Wells Fargo Account") to the account of Supplier #3 at United States Bank in Cincinnati, Ohio (the "Supplier #3 Account").

Overt Act No. 22:   On March 28, 2016, defendant HASHEMI sent a representative of Supplier #3 an email affirming that he had "transferred the rest of the money on Friday as I mentioned to you."

Overt Act No. 23:   On March 28, 2016, defendant HASHEMI wired $8,000 from his Wells Fargo Account to the Supplier #3 Account.

Overt Act No. 24:   On April 1, 2016, defendant HASHEMI used PayPal to pay Container Company #2 $1,800 for a shipping container.

Overt Act No. 25:   On April 1, 2016, a representative of Supplier #3 sent defendant HASHEMI an email attaching an invoice for

two Arrow 500 CNC machines, indicating the total selling price was
$11,500.

Overt Act No. 26:   On April 5, 2016, defendant HASHEMI sent an
email to a representative of Supplier #3 affirming "that a cashier
check for amount of $11500.00 was deposit (sic) in to your account on
today."

Overt Act No. 27:   On April 27, 2016, defendant HASHEMI sent an
email to a representative of Freight Forwarder #3 attaching a
Commercial Invoice Cum Packing List.  That Commercial Invoice Cum
Packing List falsely identified Freight Forwarder #1 as the
"Customer" and falsely indicated that the total value of the two
Arrow 1250C and two Arrow 500 CNC machines was $11,800.

Overt Act No. 28:   On April 27, 2016, defendant Hashemi caused
Freight Forwarder #3 to file Electronic Export Information that
falsely identified Freight Forwarder #1 as the Ultimate Consignee,
and falsely identified the total value of the shipment of the two
Arrow 1250C and two Arrow 500 CNC machines as $11,800.

Overt Act No. 29:   On May 11, 2016, defendant HASHEMI sent an
email to a representative of Freight Forwarder #3 stating that he had
"transferred the balance due."  The email attached a record
reflecting defendant HASHEMI's wire of $2,157 from his Citibank
Account to the account of Freight Forwarder #3 at Citibank in
Oakland, California.

Overt Act No. 30:   On May 23, 2016, defendant HASHEMI sent an
email to defendant KHAN stating in part: "the 2nd container is on it
(sic) way and it will be in Jebel Ali port on the 4th of June.  I
would appreciate you can email me the documents we need for Iran
customs as soon as you can."

Overt Act No. 31:   On May 23, 2016, defendant HASHEMI sent an email to a representative of Company A attaching a Non-Negotiable Waybill reflecting the shipment of two Arrow 1250C and two Arrow 500 CNC machines on Maersk Line from Norfolk, Virginia, to Jebel Ali in the UAE.   The email also attached a Commercial Invoice Cum Packing List that falsely identified Freight Forwarder #1 as the "Customer," falsely identified a representative of Supplier #2 as the "Salesperson" for the four machines, provided a false email address for that person, and falsely indicated that the value of the four machines was $11,800.

Overt Act No. 32:   On May 23, 2016, defendant HASHEMI sent an email to a representative of Company A attaching a Restoration Order identifying Company A as the "Customer" for two Arrow 1250C and two Arrow 500 CNC machines.   The Restoration Order, which appeared on forged Supplier #2 letterhead, falsely identified Supplier #2 as having "overhauled" the four machines.

Overt Act No. 33:   On May 27, 2016, defendant HASHEMI sent an email to defendant KHAN stating, "I have changed commercial Invoice cum packing list from Earth Best Products to [Freight Forwarder #3] per your request."   The attached Commercial Invoice Cum Packing List, which appeared on forged Freight Forwarder #3 letterhead, falsely identified Freight Forwarder #1 as the "Customer" for two Arrow 1250C and two Arrow 500 CNC machines, contained false email address information, and falsely indicated that the total value of the four machines was $11,800.

Overt Act No. 34:   On June 7, 2016, defendant KHAN sent defendant HASHEMI an email stating in part, "Maersk Line doesn't have

service to Bandar Abbas to do the stack change and Status change in order to re-route this container to BAB through maerskline itself."

Overt Act No. 35:   On June 8, 2016, defendant KHAN sent defendant HASHEMI an email stating in part, "Please resend the invoice with revise unit price immediately.   For future shipments do not use Maersk line, as they are not allowing transshipments to Iran."

Overt Act No. 36:   On June 8, 2016, defendant HASHEMI sent defendant KHAN an email attaching "a revised commercial invoice." The attached Commercial Invoice Cum Packing List, which appeared on forged Freight Forwarder #3 letterhead, falsely identified Freight Forwarder #1 as the "Customer" for two Arrow 1250C and two Arrow 500 CNC machines, contained false email address information, falsely indicated that the total value of the four machines was $6,200, and contained the forged signature of a representative of Supplier #2.

Overt Act No. 37:   On June 10, 2016, defendant HASHEMI sent an email to defendant KHAN, stating in part, "Although I have already sent you an invoice with adjusted price due to UAE duty, just in case I have attached another invoice with lesser amount (if it helps) for not paying Duty."   The attached Commercial Invoice Cum Packing List, which appeared on forged Freight Forwarder #3 letterhead, falsely identified Freight Forwarder #1 as the "Customer" for two Arrow 1250C and two Arrow 500 CNC machines, contained false email address information, falsely indicated that the total value of the four machines was $3,200, and contained the forged signature of a representative of Supplier #2.

Overt Act No. 38:   On June 19, 2016, defendant KHAN sent defendant HASHEMI an email attaching a Bill of Lading for two Arrow

1250C and two Arrow 500 CNC machines.  The Bill of Lading read in part, "Due to international sanctions (US/EU/UN) the carrier accepts no liability for cargo carried in Iranian territory the risk for loss or damages is totally on consignee/shipper."

Overt Act No. 39:  On June 21, 2016, defendant HASHEMI sent an email to a Yahoo! email address attaching a Bill of Lading for the shipment of the two Arrow 1250C and two Arrow 500 CNC machines to Company A.  The Bill of Lading read in part, "Due to international sanctions (US/EU/UN) the carrier accepts no liability for cargo carried in Iranian territory the risk for loss or damages is totally on consignee/shipper."

Overt Act No. 40:  On June 26, 2016, defendant KHAN sent an email to defendant HASHEMI, stating in part, "Do not use Maersk line and other US& (sic) EU shipping lines for shipments to Iran."

Overt Act No. 41:  On June 28, 2016, defendant KHAN sent an email to defendant HASHEMI requesting that he make payment "per our telecon" to an account at Emirates NBD Bank in the UAE.

Overt Act No. 42:  On June 28, 2016, defendant HASHEMI sent an email to defendant KHAN that attached "a copy of the wire transfers to NBD bank."

The October 21, 2017 Attempted Export via New York

Overt Act No. 43:  On January 20, 2017, in response to defendant HASHEMI's question, "there is a company asking me to send them container in Iran, I was wondering if Iran is still under Sanction?" a representative of Freight Forwarder #2 wrote to defendant HASHEMI: "It is still under sanction.  Some commodities are allowed.  If you can tell me what you want to ship we can check with the sanction authority if it is allowed to move."

Overt Act No. 44:   On May 31, 2017, defendant HASHEMI sent an email to defendant KHAN stating in part: "I am planning to send two more container (sic) on your way, the contents are same as before but before doing so can you let me know what would be cost for reexport for two cnc machines?"

Overt Act No. 45:   Between May 31 and June 7, 2017, defendant HASHEMI and defendant KHAN exchanged emails concerning the shipment identified in defendant HASHEMI's May 31, 2017 email to defendant KHAN, and in the final email defendant KHAN requested in part that defendant HASHEMI "pls (sic) arrange to make payment and let us know the shipment status."

Overt Act No. 46:   On September 11, 2017, defendant HASHEMI wired $5,000 from his Citibank Account to the Supplier #3 Account in payment for an Arrow 1250C.

Overt Act No. 47:   On September 18, 2017, defendant HASHEMI wired $12,000 from his Citibank Account to the Supplier #3 Account in payment for an Avenger 250T.

Overt Act No. 48:   On September 20, 2017, defendant HASHEMI wired $1,700 from his Citibank Account to a PNC Bank account in Cherry Hill, New Jersey belonging to Container Company #3 in payment for a shipping container.

Overt Act No. 49:   On September 22, 2017, defendant HASHEMI wired $5,500 from his Citibank Account to a Wells Fargo bank account in Scottsdale, Arizona belonging to Supplier #4 (the "Supplier #4 Account"), in partial payment for a Hawk 250.

Overt Act No. 50:   On September 25, 2017, defendant HASHEMI wired an additional $5,000 from his Citibank Account to the Supplier #4 Account to complete payment for the Hawk 250.

Overt Act No. 51:   On September 28, 2017, defendant HASHEMI wired $10,475 to a Park National Bank account in Newark, Ohio, belonging to Supplier #5, in payment for an Arrow 750.

Overt Act No. 52:   On October 11, 2017, defendant HASHEMI caused Freight Forwarder #4 to file an EEI with the BOC (1) falsely identifying Supplier #3 as the USPPI for the shipment and Freight Forwarder #1 as the Ultimate Consignee and (2) undervaluing the total value of the shipment.

The October 29, 2017 Attempted Export via Long Beach and December 10, 2017 Reshipment Post-Detention via Long Beach

Overt Act No. 53:   On or about August 22, 2017, by check drawn on his Citibank Account, defendant HASHEMI paid Supplier #6 $8,000 for an Arrow 1250C.

Overt Act No. 54:   On September 18, 2017, defendant HASHEMI sent an email to Freight Forwarder #3 stating, in part, "I would appreciate if you can let me know what other shipping lines goes to U.A.E. besides Maersk?  My buyer doesn't want to use Maersk?"

Overt Act No. 55:   On September 28, 2017, defendant HASHEMI wired $4,733.40 from his Citibank Account to the Sea Coast National Bank account in Stuart, Florida, belonging to Supplier #8 in payment for a Goodway GW 1760 Manual Lathe and an Acra LS-2S Vertical Knee Mill and related equipment.

Overt Act No. 56:   On or about October 5, 2017, defendant HASHEMI paid Container Company #4 $2,386.81 using a Visa credit card (-5387) for a shipping container.

Overt Act No. 57:   On October 16, 2017, defendant HASHEMI caused Freight Forwarder #3 to file an EEI with the BOC that falsely identified the Ultimate Consignee for the shipment.

Overt Act No. 58:   On October 18, 2017, defendant HASHEMI sent an email to a representative of Freight Forwarder #3 attaching a Written Authorization to Prepare or Transmit Shipper's Export / Import Information, which HASHEMI executed on behalf of Earth Best, identifying Earth Best as the USPPI and certifying, in part, as follows:

> The U.S. Principal Party in Interest certifies that necessary and proper documentation to accurately complete the SED or transmit the information electronically is and will be provide to the said Forwarding Agent.  The U.S. Principal Party in Interest further understands that civil and criminal penalties may be imposed for making false or fraudulent statements or for the violation of any United States laws or regulations on exportation and agrees to be bound by all statements of said agent based upon information or documentation provided by exporter to said agent.

Overt Act No. 59:   On October 20, 2017, defendant HASHEMI sent an email to a representative of Freight Forwarder #3, which attached a Commercial Invoice Cum Packing List.  The Commercial Invoice Cum Packing List falsely identified Freight Forwarder #1 as the "Customer" and falsely indicating that the total value of the shipment was $12,800.

Overt Act No. 60:   On October 24, 2017, defendant HASHEMI caused Freight Forwarder #3 to file an amendment to the previously filed Electronic Export Information that falsely identified Freight Forwarder #1 as the Ultimate Consignee for the shipment.

Overt Act No. 61:   On October 27, 2017, defendant HASHEMI sent defendant KHAN an email stating, "Please be advised a 40' (sic) Container is suppose (sic) to be on its way to Dubai [].  The content is the same as before used Machinery."

Overt Act No. 62:   In response to defendant HASHEMI's October 27, 2017 email, on October 29, 2017, defendant KHAN sent an email to HASHEMI requesting that he provide commercial documents and a draft bill of lading for the shipment.

Overt Act No. 63:   On November 10, 2017, defendant HASHEMI sent a CBP representative an email attaching a receipt for $3,500 reflecting his purchase of a TNL 16G (for parts only) and bar feeder. He also attached invoices falsely indicating (1) that he paid $2,000 to Supplier #8 for the GW1760 Manual Lathe and LS-2S Vertical Knee Mill and (2) that he paid Supplier #6 $4,000 for the Arrow 1250C.

Overt Act No. 64:   On November 16, 2017, defendant HASHEMI sent an email to a CBP representative attaching a signed and certified License Determination Fact Sheet, which falsely indicated (1) that the Arrow 1250C, GW 1760 manual lathe, LS-2S Vertical Knee Mill, TNL 16G, and bar feeder were destined for an affiliate of Unidentified Co-Conspirator #2 in the UAE, and (2) that none of the items were controlled for export under the EAR.

Overt Act No. 65:   On January 15, 2018, defendant HASHEMI sent an email to a representative of Freight Forwarder #5 attaching a packing list identifying the Arrow 1250C, GW 1760 manual lathe, LS-2S Vertical Knee Mill, TNL 16G, and bar feeder, among other items.

Overt Act No. 66:   On January 16, 2018, defendant HASHEMI sent an email to a representative of Freight Forwarder #5 confirming and approving a quote for shipping containers from the UAE to Iran.

Overt Act No. 67:   On January 24, 2018, defendant HASHEMI sent an email to a representative of Freight Forwarder #5 attaching a North American Free Trade Agreement Certificate of Origin ("Certificate of Origin") concerning the TNL 16G, GW1760, and LS-2S.

That certificate, which included the forged electronic signature of a representative of Supplier #4, falsely identified Supplier #4 as the exporter of the machines.

Overt Act No. 68:   On February 10, 2018, defendant HASHEMI sent an email to a representative of Freight Forwarder #6 attaching a Certificate of Origin concerning the TNL 16G, GW1760, and LS-2S. That certificate, which includes the forged electronic signature of a representative of Supplier #4, falsely identifies Freight Forwarder #3 as the exporter of the machines.   Defendant HASHEMI also attached to the email a Commercial Invoice Cum Packing List that appeared on forged Freight Forwarder #3 letterhead.   That document falsely identified a representative of Supplier #2 as the "Salesperson" for the machines, provided a false email address for that person, falsely indicated that the value of both machines was $4,700, and falsely identified a company in the UAE as the "customer."

Overt Act No. 69:   On February 11, 2018, defendant HASHEMI sent an email to representatives of Freight Forwarder #5 and Freight Forwarder #6 attaching the same Commercial Invoice Cum Packing List that he had sent on February 10, 2018, except this version also included the forged signature of a representative of Freight Forwarder #3.

The November 9, 2017 Attempted Export and January 25, 2018 Export via Long Beach

Overt Act No. 70:   On October 19, 2017, defendant HASHEMI wired $2,025 to an American Riviera Bank account in Santa Barbara, California, belonging to Container Company #4, in payment for a shipping container.

Overt Act No. 71:   On November 1, 2017, defendant HASHEMI caused Freight Forwarder #4 to file an Electronic Export Information falsely indicating that Supplier #3 was the USPPI and that Freight Forwarder #1 in the UAE was the Ultimate Consignee for the shipment. Defendant HASHEMI later caused Freight Forwarder #4 to amend that Electronic Export Information, after which that information falsely indicated that Freight Forwarder #6 was the Ultimate Consignee for the shipment.

Overt Act No. 72:   On November 30, 2017, defendant HASHEMI certified and submitted to CBP a License Determination Fact Sheet, which falsely indicated that (1) the CNC machines that he was exporting were not controlled for export under the EAR and (2) the destination country for the machines was the UAE.

Overt Act No. 73:   On November 30, 2017, defendant KHAN sent defendant HASHEMI a completed Statement by Ultimate Consignee and Purchaser form (Form BIS-711), which falsely indicated that: (1) the destination country for the machines was the UAE; (2) that the purchaser of the machines was Freight Forwarder #1; and (3) that an affiliate of Freight Forwarder #1 was the ultimate consignee.

Overt Act No. 74:   On November 30, 2017, defendant HASHEMI certified and submitted to CBP a Statement By Ultimate Consignee and Purchaser, which falsely indicated that: (1) the destination country for the machines was the UAE; (2) that the purchaser of the machines was Freight Forwarder #1; and (3) that an affiliate of Freight Forwarder #1 was the ultimate consignee.

Overt Act No. 75:   On January 22, 2018, defendant HASHEMI carbon copied an email to a representative of Freight Forwarder #4

falsely indicating that the Ultimate Consignee for the shipment was Freight Forwarder #6.

Overt Act No. 76:   On April 6, 2018, defendant HASHEMI sent an email to a representative of Freight Forwarder #2 attaching a PDF document showing a receipt for the deposit of $2,900 into an affiliate of Freight Forwarder #2's Wells Fargo bank account.

Defendant HASHEMI's Material False Statements to a Federal Agent

Overt Act No. 77:   On or about February 12, 2018, defendant HASHEMI knowingly and willfully made materially false, fictitious, and fraudulent statement and representations to a BIS Special Agent. Specifically, defendant HASHEMI stated: (1) that the final destination for the CNC machines that he exported from the United States was an affiliate of Freight Forwarder #1; (2) that the first time he ever exported a CNC machine was on May 4, 2016; (3) that he sold the CNC machines that he had exported to an affiliate of Freight Forwarder #1; (4) that he did not know that a license was required to lawfully export of CNC machines from the United States at the time he exported those machines; (5) that none of the CNC machines that he exported went to Company A; and (6) that he did not intend to export any CNC machines to Iran.

## COUNT TWO

[50 U.S.C. § 1705(a), (c);

31 C.F.R. §§ 560.203, 560.204;

18 U.S.C. § 2(a), (b)]

On or about May 4, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI ("HASHEMI"), also known as ("aka") "Eddie Hashemi," and defendant FEROZ KHAN ("KHAN"), aka "Feroskhan," aka "Feros," aiding and abetting each other, willfully attempted to violate, and cause to be violated, the United States trade regulations with Iran by attempting to export, sell, and supply, from the United States to Iran, via the United Arab Emirates ("UAE"), Computer Numerical Control ("CNC") machines, without first having applied for and obtained by such application the necessary license and authorization from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), for such export, sale, and supply.

Specifically, defendant HASHEMI, a United States person, and defendant KHAN, caused four CNC machines — namely, a Cincinnati Arrow 1250C (SN: 7064-A00-KK-0105), a Cincinnati Arrow 500 (SN: 7042-A00-96-1216), a Cincinnati Arrow 1250C (SN: 7064-A00-98-0017), and a Cincinnati Arrow 500 (SN: 7042-A00-KT-2190) — to be sent to the United Arab Emirates knowing and intending that they would be transshipped to Iran, without obtaining a license from OFAC.

## COUNT THREE

[50 U.S.C. § 1705(a), (c);

15 C.F.R. §§ 742.1, 742.3, 742.8, 746.7, 758.1, 764.2;

18 U.S.C. § 2(a), (b)]

On or about May 4, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI ("HASHEMI"), also known as ("aka") "Eddie Hashemi," and defendant FEROZ KHAN ("KHAN"), aka "Feroskhan," aka "Feros," aiding and abetting each other, knowingly and willfully attempted to export and caused to be exported from the United States to the United Arab Emirates and to Iran, items under the jurisdiction of the United States Department of Commerce, namely, Computer Numerical Control ("CNC") machines, without first having obtained the required license from the United States Department of Commerce. The CNC machines were controlled for nuclear nonproliferation and anti-terrorism reasons, and a license from the Department of Commerce was required under the Export Administration Regulations for the export of these items from the United States.

## COUNT FOUR

[50 U.S.C. § 1705(a), (c);

31 C.F.R. §§ 560.203, 560.204;

18 U.S.C. § 2(a), (b)]

On or about October 21, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI ("HASHEMI"), also known as ("aka") "Eddie Hashemi," and defendant FEROZ KHAN ("KHAN"), aka "Feroskhan," aka "Feros," aiding and abetting each other, knowingly and willfully attempted to violate, and cause to be violated, the United States trade regulations with Iran by attempting to export, sell, and supply, from the United States to Iran, via the United Arab Emirates ("UAE"), Computer Numerical Control ("CNC") machines, without first having applied for and obtained by such application the necessary license and authorization from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), for such export, sale, and supply.

Specifically, defendant HASHEMI, a United States person, and defendant KHAN attempted to cause four CNC machines – namely, a Cincinnati Avenger 250T (SN: 365002-97-014), a Cincinnati Arrow 1250C (SN: 7064-A00-KK-0088), a Cincinnati Arrow 750 (SN: 7043 FOA-98-1092), and a Cincinnati Hawk 250 (SN: 7060 F00 RA 0008) – to be sent to the United Arab Emirates knowing and intending that they would be transshipped to Iran, without obtaining a license from OFAC.

## COUNT FIVE

[50 U.S.C. § 1705(a), (c);

15 C.F.R. §§ 15 C.F.R. §§ 742.1, 742.3, 742.8, 746.7, 758.1, 764.2;

18 U.S.C. § 2(a), (b)]

On or about October 21, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI ("HASHEMI"), also known as ("aka") "Eddie Hashemi," and defendant FEROZ KHAN ("KHAN"), aka "Feroskhan," aka "Feros," aiding and abetting each other, knowingly and willfully attempted to export and caused to be exported from the United States the United Arab Emirates and to Iran, items under the jurisdiction of the United States Department of Commerce, namely, Computer Numerical Control ("CNC") machines, without first having obtained the required license from the United States Department of Commerce.  The CNC machines were controlled for nuclear nonproliferation and anti-terrorism reasons, and a license from the Department of Commerce was required under the Export Administration Regulations for the export of these items from the United States.

## COUNT SIX

[50 U.S.C. § 1705(a), (c);

31 C.F.R. §§ 560.203, 560.204;

18 U.S.C. § 2(a), (b)]

On or about October 29, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI ("HASHEMI"), also known as ("aka") "Eddie Hashemi," and defendant FEROZ KHAN ("KHAN"), aka "Feroskhan," aka "Feros," aiding and abetting each other, knowingly and willfully attempted to violate, and cause to be violated, the United States trade regulations with Iran by attempting to export, sell, and supply, from the United States to Iran, via the United Arab Emirates ("UAE"), Computer Numerical Control ("CNC") machines, without first having applied for and obtained by such application the necessary license and authorization from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), for such export, sale, and supply.

Specifically, defendant HASHEMI, a United States person, and defendant KHAN attempted to cause two CNC machines — namely, a Traub TNL 16G (SN: 7064-A00-KK0120) and a Cincinnati Arrow 1250C (SN: 7064-A00-KK0120) — to be sent to the United Arab Emirates knowing and intending that they were to be transshipped to Iran, without obtaining a license from OFAC.

COUNT SEVEN

[50 U.S.C. § 1705(a), (c);

15 C.F.R. §§ 742.1, 742.3, 742.8, 746.7, 758.1, 764.2;

18 U.S.C. § 2(a), (b)]

On or about October 29, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI, also known as ("aka") "Eddie Hashemi," and defendant FEROZ KHAN, aka "Feroskhan," aka "Feros," aiding and abetting each other, knowingly and willfully attempted to export and caused to be exported from the United States to the United Arab Emirates and to Iran, items under the jurisdiction of the United States Department of Commerce, namely, Computer Numerical Control ("CNC") machines, without first having obtained the required license from the United States Department of Commerce.  The CNC machines were controlled for nuclear nonproliferation and anti-terrorism reasons, and a license from the Department of Commerce was required under the Export Administration Regulations for the export of these items from the United States.

COUNT EIGHT

[18 U.S.C. § 554; 18 U.S.C. § 2(a), (b)]

On or about February 15, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI ("HASHEMI"), aka "Eddie Hashemi":

(1) attempted to fraudulently and knowingly send and export from the United States merchandise, articles, and objects contrary to a law and regulation of the United States; and

(2) did, and attempted to, knowingly receive, conceal, buy, and sell, and did, and attempted to, knowingly facilitate the transportation, concealment, and sale of merchandise, articles, and objects, knowing that they would be intended for exportation contrary to a law and regulation of the United States.

Specifically, defendant HASHEMI did, aided and abetted, and willfully caused others known and unknown to the Grand Jury, to purchase, export, transport, and send from the United States of America a Computer Numerical Control ("CNC") machine – namely, a Cincinnati Avenger 200T (SN: 3650C0297-0016) – after representing that the ultimate country of destination for that CNC machine was the United Arab Emirates, when in fact defendant HASHEMI knew that the CNC machine was intended to be sent to Iran.  Defendant HASHEMI also effected the export of the CNC machine without first applying for, and obtaining by such application, the necessary license and authorization before sending and exporting the CNC machine from the United States, and by filing and causing to be filed a false Electronic Export Information.

## COUNT NINE

### [18 U.S.C. § 554; 18 U.S.C. § 2(a), (b)]

On or about May 4, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI ("HASHEMI"), aka "Eddie Hashemi":

(1) attempted to fraudulently and knowingly send and export from the United States merchandise, articles, and objects contrary to a law and regulation of the United States; and

(2) did, and attempted to, knowingly receive, conceal, buy, and sell, and did, and attempted to, knowingly facilitate the transportation, concealment, and sale of merchandise, articles, and objects, knowing that they would be intended for exportation contrary to a law and regulation of the United States.

Specifically, defendant HASHEMI did, aided and abetted, and willfully caused others known and unknown to the Grand Jury, to purchase, export, transport, and send from the United States of America four Computer Numerical Control ("CNC") machines – namely, a Cincinnati Arrow 1250C (SN: 7064-A00-KK-0105), a Cincinnati Arrow 500 (SN: 7042-A00-96-1216), a Cincinnati Arrow 1250C (SN: 7064-A00-98-0017), and a Cincinnati Arrow 500 (SN: 7042-A00-KT-2190) – after representing that the ultimate country of destination for those CNC machines was the United Arab Emirates, when in fact defendant HASHEMI knew that those CNC machines were intended to be sent to Iran. Defendant HASHEMI also effected the export of the CNC machines without first applying for, and obtaining by such application, the necessary licenses and authorizations before sending and exporting the CNC machines from the United States, and by filing and causing to be filed a false Electronic Export Information.

COUNT TEN

[18 U.S.C. § 554; 18 U.S.C. § 2(a), (b)]

On or about October 21, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI ("HASHEMI"), aka "Eddie Hashemi":

(1) attempted to fraudulently and knowingly send and export from the United States merchandise, articles, and objects contrary to a law and regulation of the United States; and

(2) did, and attempted to, knowingly receive, conceal, buy, and sell, and did, and attempted to, knowingly facilitate the transportation, concealment, and sale of merchandise, articles, and objects, knowing that they would be intended for exportation contrary to a law and regulation of the United States.

Specifically, defendant HASHEMI did, aided and abetted, and willfully caused others known and unknown to the Grand Jury, to purchase, export, transport, and send from the United States of America four Computer Numerical Control ("CNC") machines – namely, a Cincinnati Avenger 250T (SN: 365002-97-014), a Cincinnati Arrow 1250C (SN: 7064-A00-KK-0088), a Cincinnati Arrow 750 (SN: 7043 FOA-98-1092), and a Cincinnati Hawk 250 (SN: 7060 F00 RA 0008) – after representing that the ultimate country of destination for those CNC machines was the United Arab Emirates, when in fact defendant HASHEMI knew that those CNC machines were intended to be sent to Iran. Defendant HASHEMI also effected the export of the CNC machines without first applying for, and obtaining by such application, the necessary licenses and authorizations before sending and exporting the CNC machines from the United States, and by filing and causing to be filed a false Electronic Export Information.

COUNT ELEVEN

[18 U.S.C. § 554; 18 U.S.C. § 2(a), (b)]

On or about October 29, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI ("HASHEMI"), aka "Eddie Hashemi":

(1) attempted to fraudulently and knowingly send and export from the United States merchandise, articles, and objects contrary to a law and regulation of the United States; and

(2) did, and attempted to, knowingly receive, conceal, buy, and sell, and did, and attempted to, knowingly facilitate the transportation, concealment, and sale of merchandise, articles, and objects, knowing that they would be intended for exportation contrary to a law and regulation of the United States.

Specifically, defendant HASHEMI did, aided and abetted, and willfully caused others known and unknown to the Grand Jury, to purchase, export, transport, and send from the United States of America two Computer Numerical Control ("CNC") machines – namely, a Traub TNL 16G (SN: 7064-A00-KK0120 and a Cincinnati Arrow 1250C (SN: 7064-A00-KK0120) – after representing that the ultimate country of destination for those CNC machines was the United Arab Emirates, when in fact defendant HASHEMI knew that those CNC machines were intended to be sent to Iran.  Defendant HASHEMI also effected the export of the CNC machines without first applying for, and obtaining by such application, the necessary licenses and authorizations before sending and exporting the CNC machines from the United States, and by filing and causing to be filed a false Electronic Export Information.

COUNTS TWELVE THROUGH SEVENTEEN

[18 U.S.C. § 1956(a)(2)(A)]

On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI ("HASHEMI"), aka "Eddie Hashemi," transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States, namely, a bank account in the Central District of California, to and through a place outside the United States, namely, Canada and the United Arab Emirates, with the intent to promote the carrying on of a specified unlawful activity, i.e., violating the International Emergency Economic Powers Act, 50 U.S.C. § 1701-1706 and 31 C.F.R. §§ 560.203, 560.204 and 15 C.F.R. §§ 742.1, 742.3, 742.8, 746.7, 758.1, 764.2; 30 C.F.R. § 30.2, and unlawful smuggling of goods from the United States in violation of 18 U.S.C. § 554 and § 2(a) and (b).

Specifically, the transactions described in counts Twelve through Seventeen were payments made by defendant HASHEMI to Canadian suppliers of Computer Numerical Control ("CNC") machines and shipping containers and to Canadian and United Arab Emirates freight forwarding services for the purpose of purchasing, smuggling, and illegally exporting the CNC machines without first applying for, and obtaining by such application, the necessary licenses and authorizations before sending and exporting the CNC machines from the United States.

//

//

| COUNT | DATE | AMOUNT | PAYEE |
|---|---|---|---|
| TWELVE | December 9, 2015 | $6,250 | Supplier #1 |
| THIRTEEN | December 11, 2015 | $6,675.82 | Supplier #1 |
| FOURTEEN | January 14, 2016 | $1,599.55 | Container Company #1 |
| FIFTEEN | January 28, 2016 | $421.48 | Container Company #1 |
| SIXTEEN | February 26, 2016 | $4,559 | Freight Forwarder #2 |
| SEVENTEEN | April 4, 2016 | $239.40 | Freight Forwarder #1 |

COUNT EIGHTEEN

[13 U.S.C. §§ 305(a)(1), 2(b); 15 C.F.R. §§ 30.2, 30.37]

On or about April 27, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI ("HASHEMI"), aka "Eddie Hashemi," knowingly submitted false and misleading export information, and willfully caused another to submit false and misleading export information for four computer numerical control ("CNC") machines valued at over $2,500 – namely, a Cincinnati Arrow 1250C (SN: 7064-A00-KK-0105), a 1996 Cincinnati Arrow 500 (SN: 7042-A00-96-1216), a 1998 Cincinnati Arrow 1250C (SN: 7064-A00-98-0017), and a Cincinnati Arrow 500 (SN: 7042-A00-KT-2190) – through the Automated Export System, in violation of 15 C.F.R §§ 30.2, 30.37, 13 U.S.C. § 305(a)(1), and 18 U.S.C. § 2(b).

Specifically, defendant HASHEMI filed and caused to be filed electronic export information that falsely indicated (1) the U.S. Principal Party; (2) the ultimate consignee; (3) the country of ultimate destination; and (4) the total value of the CNC machines, when defendant well knew that such information was false.

## COUNT NINETEEN

[13 U.S.C. §§ 305(a)(1), 2(b); 15 C.F.R. §§ 30.2, 30.37]

On or about October 11, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI, aka "Eddie Hashemi," knowingly failed to file and submitted false and misleading export information, and willfully caused another to fail to file and to submit false and misleading export information, for four computer numerical control machines valued at over $2,500 – namely, a Cincinnati Avenger 250T (SN: 365002-97-014), a Cincinnati Arrow 1250C (SN: 7064-A00-KK-0088), a Cincinnati Arrow 750 (SN: 7043 FOA-98-1092), and a Cincinnati Hawk 250 (SN: 7060 F00 RA 0008) – through the Automated Export System, in violation of 15 C.F.R §§ 30.2, 30.37, 13 U.S.C. § 305(a)(1), and 18 U.S.C. § 2(b).

Specifically, defendant HASHEMI filed and caused to be filed electronic export information that falsely indicated (1) the U.S. Principal Party; (2) the ultimate consignee; (3) the country of ultimate destination; and (4) the total value of the CNC machines, when defendant well knew that such information was false.

COUNT TWENTY

[13 U.S.C. §§ 305(a)(1), 2(b); 15 C.F.R. §§ 30.2, 30.37]

On or about October 16, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant MEHDI HASHEMI, aka "Eddie Hashemi," knowingly failed to file and submitted false and misleading export information, and willfully caused another to fail to file and to submit false and misleading export information, for two computer numerical control machines valued at over $2,500 – namely, a Traub TNL 16G (SN: 129) and a Cincinnati Arrow 1250C (SN: 7064-A00-KK0120) – through the Automated Export System, in violation of 15 C.F.R §§ 30.2, 30.37, 13 U.S.C. § 305(a)(1), and 18 U.S.C. § 2(b).

Specifically, defendant HASHEMI filed and caused to be filed electronic export information that falsely indicated (1) the U.S. Principal Party; (2) the ultimate consignee; (3) the country of ultimate destination; and (4) the total value of the CNC machines, when defendant well knew that such information was false.

45

COUNT TWENTY-ONE

[18 U.S.C. § 1001(a)(2)]

On or about February 12, 2018, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the Department of Commerce, Bureau of Industry and Security and the Department of Homeland Security, Immigration and Customs Enforcement, and the Department of Homeland Security, Customs and Border Protection, namely, an investigation into the export of computer numerical control ("CNC") machines from the United States, defendant MEHDI HASHEMI ("HASHEMI"), aka "Eddie Hashemi," knowingly and willfully made materially false, fictitious, and fraudulent statements and representations.

Specifically, defendant HASHEMI stated: (1) that the final destination for the CNC machines that he exported from the United States was an affiliate of Freight Forwarder #1; (2) that the first time he ever exported a CNC machine was on May 4, 2016; (3) that he sold the CNC machines that he had exported to an affiliate of Freight Forwarder #1; (4) that he did not know that a license was required to lawfully export the CNC machines from the United States at the time he exported those machines; (5) that none of the CNC machines that he exported went to Company A; and (6) that he did not intend to export any CNC machines to Iran.

The statements were materially false, fictitious, and fraudulent because, as defendant HASHEMI well knew when he made those statements: (1) the final destination for the CNC machines that he exported from the United States was not an affiliate of Freight Forwarder #1; (2) he had exported CNC machines from the United States before May 4, 2016; (3) Freight Forwarder #1 did not purchase any CNC

46

machines from him; (4) he knew that a license was required to lawfully export of CNC machines at the time he exported those machines; (5) at least some of the CNC machines that he exported went to Company A; and (6) that he intended to export CNC machines to Iran.

### FORFEITURE ALLEGATION ONE
[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event that defendant MEHDI HASHEMI, also known as ("aka") "Eddie Hashemi," and defendant FEROZ KHAN, aka "Feroskhan," aka "Feros,", or either of them, are convicted of the offense set forth Count One of this Indictment.

2.   The defendant, if so convicted, shall forfeit to the United States of America the following property:

(a)   All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any such offense; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot

1   be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event that defendant MEHDI HASHEMI, also known as ("aka") "Eddie Hashemi," and defendant FEROZ KHAN, aka "Feroskhan," aka "Feros," or either of them, are convicted of the offenses set forth in any of Counts Two through Seven of this Indictment.

2.   The defendant, if so convicted, shall forfeit to the United States of America the following:

    (a)   All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any such offense; and

    (b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished

in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 982 and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c), in the event of defendant MEHDI HASHEMI's, also known as ("aka") "Eddie Hashemi," conviction of the offenses set forth in any of Counts Eight through Eleven of this Indictment.

2. The Defendant, if so convicted, shall forfeit to the United States of America the following:

(a) Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an

intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000.00 or more in any twelve-month period.

FORFEITURE ALLEGATION FOUR

[18 U.S.C. § 981(b) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(b) and Title 28, United States Code, Section 2461(c), in the event of the defendant MEHDI HASHEMI's, also known as ("aka") "Eddie Hashemi," conviction of the offenses set forth in any of Counts Twelve through Seventeen of this Indictment.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)   All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any such offense; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

//

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/s/
_____
Foreperson

NICOLA T. HANNA
United States Attorney

PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, Terrorism and Export
Crimes Section

GEORGE E. PENCE
Assistant United States Attorney
Terrorism and Export Crimes
Section